UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**THOMAS LEE DILLON**,

                Plaintiff,

                                          No. 2:13-cv-12484

vs.                                   Hon. Gerald E. Rosen

**NORFOLK SOUTHERN RAILWAY
COMPANY**,

                Defendant.

_____/

## OPINION AND ORDER REGARDING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Plaintiff Thomas Lee Dillon applied for employment with Defendant Norfolk Southern Railway Company in 2007. During the hiring process, Defendant conducted a medical examination to ensure that Plaintiff was fit for service. Finding nothing remarkable, Defendant hired Plaintiff. Four years later, Plaintiff went out on medical leave and in processing paperwork Plaintiff submitted to allow him to return to work, Defendant discovered that Plaintiff had failed to disclose a previous injury during the hiring process. So Defendant separated Plaintiff from employment for this failure on June 8, 2011. Plaintiff commenced this litigation on June 6, 2013.

1

The issue presented by Plaintiff's one-count Complaint under the Americans with Disabilities Act (ADA) is limited. Plaintiff does not claim that Defendant violated the ADA by separating him on the basis of a disability or by failing to provide him with a reasonable accommodation. Nor does Plaintiff, a unionized employee, seek review of Defendant's actions under the Railway Labor Act. Instead, this case involves an interesting intersection between an employer's obligation to keep certain information related to medical examinations and inquiries "confidential" under the ADA and an employer's ability to take adverse actions against its employees for failing to provide accurate information during the hiring process.

Plaintiff claims that Defendant violated 42 U.S.C. § 12112(d), the ADA's provision governing the confidentiality of information disclosed in the process of medical examinations and inquiries, when its Medical Department disclosed his prior injury to its Labor Relations Department and his supervisor, as well as at a disciplinary hearing. Defendant disagrees, essentially asserting that the ADA cannot be used as a shield to insulate an employee's misrepresentations. The parties have completed discovery and have now filed cross-motions for summary judgment. Having reviewed and considered the parties' briefs and supporting documents and the entire record of this matter, the Court has determined that the pertinent allegations and legal arguments are sufficiently addressed in these

2

materials and that oral argument would not assist in the resolution of this motion. Accordingly, the Court will decide the parties' motions "on the briefs." See L.R. 7.1(f)(2). This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

The facts of this matter are straightforward and undisputed. Plaintiff applied for employment with Defendant in February 2007. (Ex. 1 to Plf's Dep., Dkt. # 21-1, at 22-27). Defendant hired Plaintiff as a train conductor in August 2007. (Plf's Dep., Dkt. # 19-1, at 13). As part of Defendant's hiring practices and pursuant to the ADA, Plaintiff then underwent a post-offer, pre-employment medical examination (known as an employment entrance examination) at Defendant's request on August 10, 2007. (Ex. 2 to Plf's Dep., Dkt. # 21-1, at 28-30).

During this examination, Plaintiff filled out a medical history questionnaire known as the MED-15. It asked Plaintiff whether he previously or currently had twenty-five medical conditions, and instructed Plaintiff to answer with "yes," "no," or "don't know." (*Id.* at 28). One of those questions asked whether Plaintiff had any "hospitalization or surgical procedures," to which Plaintiff marked "No." (*Id.*). Another asked whether Plaintiff had a "[m]issing/impaired hand, arm, foot, leg, finger, toe," and Plaintiff again marked "No." (*Id.*) Indeed, the only medical condition that Plaintiff reported was a contusion on his knee, apparently related to

3

a recent dirt bike accident. (*Id.* at 28-29; Plf's Dep., at 21-22, 42). The MED-15 also contained the following "Release, Verification, and Disclosure Statement:"

> I certify that the answers given herein are true and complete to the best of my knowledge. *I authorize release of this information to my employer/prospective employer and whatever investigation is deemed necessary to confirm statements contained in this report of medical examination. If it is determined, through investigation or otherwise at any time, that my answers are untrue or misleading, or material information is omitted, I understand my employment may be terminated, or, if applicable my application for employment may be rejected.* If I am an applicant for employment, I acknowledge that an offer of employment, contingent on satisfactory completion of this medical examination, a urine drug screen, and a background investigation, has been made to me.

(Ex. 1 to Plf's Dep., Dkt. # 21-1, at 29 (emphasis added); *see also* Plf's Dep., at 23-24).

As it turns out, his answers on the MED-15 were not true and complete to the best of his knowledge. Plaintiff broke his left femur as a teenager in an automobile accident, requiring hospitalization and the insertion of a titanium rod that connected to his leg with screws. (Plf's Dep., at 34-38). It took six weeks to heal and Plaintiff still has a two-inch scar on his leg from the incision. (*Id.* at 38-40). Though Plaintiff alleges he orally disclosed this injury to the physician completing the examination because it "was pertinent information [Defendant] . . . needed to know" (*Id.* at 44-45), he did not change his written answers on the MED-

4

15.  (*Id.* at 46).[1]  Absent a reference to this injury on the MED-15, Defendant's

Medical Department would not have known about this injury.  (Dr. Lena's Dep.,

Dkt. # 19-8, at 17).

Plaintiff passed his employment entrance examination and had several years

of unremarkable employment with Defendant.  This changed in April 2011, when

he notified his supervisor that he had injured his leg and would need to take some

time off -- which Defendant granted.  (Plf's Dep., at 69-70).  In order for Plaintiff

to return to work, Defendant advised Plaintiff of the following:

> [D]ue to your recent medical absence and the safety-sensitive nature
> of your position, medical information will be needed in order to
> determine your fitness for service. . . . Upon your release to return to
> work by your treating doctor(s), your treating physician(s) must
> provide copies of all medical records related to the evaluation and
> treatment of the medical condition(s) that has resulted in your medical
> absence.  These medical records must include all doctor's office
> visit/progress notes, evaluation reports, diagnostic test reports,
> operative reports (if applicable) and treatment records, as well as a
> work release that describes any work restrictions or accommodations
> currently deemed necessary (and if any, the anticipated duration of).

(Ex. 6 to Plf's Dep., Dkt. # 21-1, at 33-34).  Among the documents that Plaintiff

submitted to Defendant was a treatment note by Dr. Paul Dougherty dated May 4,

2011.  (Ex. 11 to Plf's Dep., Dkt. # 21-1, at 35-36).  In this note, Dr. Dougherty

referenced Plaintiff's prior injury, writing that he "has a known history of a left

---

[1] He also testified that he asked a nurse for clarification as to what was meant by
"surgeries," who responded that it referred to the removal of his tonsils, adenoids,
appendix, etc.  Plaintiff took this to mean "major surgery."  (Plf's Dep., at 29-32).

5

femur fracture fixed with intramedullary nailing approximately 15 years ago" that "heal[ed] without incident." (*Id.* at 36).

One of Defendant's nurses, Anita Euell, reviewed Dr. Dougherty's note, discovered Plaintiff's non-disclosure of this injury, and informed Dr. Paula Lina, Defendant's Associate Medical Director. (Dr. Lina's Dep., at 20-21). Dr. Lina directed Euell to consult with Defendant's Labor Relations Department to determine if "they wanted to take some kind of administrative action," including discipline. (*Id.* at 21). Upon this consultation, Dr. Lina sent the following memorandum on May 19, 2011 to Plaintiff's supervisor, C.M. Irvin, Jr., as part of making the decision to conduct a disciplinary investigation:

> The Medical Department has received a medical report dated May 4, 2011 from Dr. Paul Dougherty regarding Mr. Dillon's left leg condition. The report documents that Mr. Dillon has a history of a left femur fracture fixed with intramedullary nailing approximately 15 years ago. This information was not disclosed during Mr. Dillon's August 10, 2007 pre-placement physical examination.
>
> On or around August 10, 2007, Mr. Dillon completed a pre-placement physical examination FORM MED-15. On the history portion of the MED-15 examination form, he was specifically asked if he ever had an "impaired hand, arm, foot, leg, finger, toe" and Mr. Dillon checked the box for "No." He was also asked if he ever had a "Hospitalization or Surgical procedure" or "Other illnesses or injuries" and Mr. Dillon again checked the box for "No." Mr. Dillon signed the statement on the MED-15 form attesting to the fact that his responses "are true and complete" to the best of his knowledge.
>
> As you are aware, the position of Conductor is safety-sensitive and physically demanding. The essential job functions of this position include such activities as prolonged walking/standing on uneven and

6

at times sloping terrain (ballast), heavy lifting/carrying and climbing in all weather conditions. Applicants for these positions are screened for all medical conditions which could impact their ability to safely perform these duties. The pre-placement medical assessment requires that applicants provide an accurate, honest and complete medical history. During his pre-placement exam, Mr. Dillon failed to divulge any information regarding his history of a femur fracture fixed with intramedullary nailing, and his medical qualification substantially hinged upon this denial.

Mr. Dillon's self reported medical history on August 10, 2007, and therefore, the basis for his qualification have been called into question following the receipt and review of the medical documentation and information noted above. When the Norfolk Southern Medical Department qualified Mr. Dillon as medically fit to begin employment, it did so based upon what appears to be materially false information. If Mr. Dillon had disclosed at the time of his pre-placement medical examination that he had experienced a femur fracture fixed with intramedullary nailing, he would not have been medically qualified at that time for a position of Conductor.

(Ex. 10 to Plf's Mtn., Dkt. # 19-10; Dr. Lina's Dep., at 42).[2] In disclosing the content of Plaintiff's medical records, Dr. Lina "expect[ed Irvin] to follow the corporate policy and procedures and law when handling or reviewing or looking at medical records." (Dr. Lina's Dep., at 27-28). That policy "assur[es] that

---

[2] Dr. Lina drafted two versions of this memorandum. The version in text reflects the final version, which incorporates edits made by the Labor Relations Department. Of note, Plaintiff points out that the final version omits the following prior language regarding whether Defendant would have hired Plaintiff if he had disclosed the leg injury: "[H]ad Mr. Dillon disclosed his left leg condition . . . , absent medical documentation supporting his fitness for service, Mr. Dillon would not have been considered a candidate for Train Service." (Ex. 9 to Plf's Mtn., Dkt. # 19-9; Plf's Mtn., Dkt. # 19, at 19-20). The difference between the two letters and the larger issue of whether the leg injury would have disqualified Plaintiff from employment is not -- as Plaintiff admits -- relevant to his Section 12112(d) claim. (Plf's Mtn., Dkt. # 19, at 27-28).

employee medical records are collected and maintained confidentially and in accordance with applicable law, including the Americans with Disabilities Act." (Ex. 7 to Dr. Lina's Dep., Dkt. 21-2, at 19-22).

On May 26, 2011, Assistant Division Superintendent Michael Wilson conducted an investigative hearing pursuant to Defendant's Collective Bargaining Agreement (CBA) with the United Transportation Union. (Plf's Dep., at 58; Ex. 6 to Plf's Mtn., Dkt. # 19-6, at 1; Ex. C to Def's Mtn., Dkt. # 21-3, at ¶¶ 6-7). The purpose of the hearing was "to determine the facts and place [Plaintiff's] responsibility, if any, in connection with [his] falsification of documents pertinent to [his] application for employment on August 10th, 2007." (Ex. 6 to Plf's Mtn., Dkt. # 19-6, at 1). A.P. Sherman, Defendant's Division Road Foreman, presented Defendant's evidence as the Charging Officer. (*Id.* at 4-18, 40-42). Plaintiff attended the hearing with two union representatives. (*Id.* at 1-3). At the hearing, Sherman introduced three documents: (1) a redacted version of the MED-15 that only showed information pertinent to Plaintiff's failure to disclose his prior injury; (2) a redacted version of Dr. Dougherty's May 4, 2011 treatment note; and (3) Dr. Lina's May 19, 2011 memorandum to Superintendent Irvin. (*Id.* at 47-50).[3] Wilson issued his decision on June 8, 2011, dismissing Plaintiff from service after

---

[3] In contrast, Plaintiff's union representatives introduced complete and unredacted versions of these and other documents at the hearing. (Ex. 6 to Plf's Mtn., Dkt. # 19-6, at 47-62).

concluding that "[t]he evidence adduced in this investigation clearly proved" that Plaintiff "falsif[ied] . . . documents pertinent to [his] application for employment on August 10, 2007."  (Ex. 7 to Plf's Mtn., Dkt. # 19-7).

Before filing this action, Plaintiff appealed Wilson's decision pursuant to his rights under the CBA.  The parties ultimately resolved Plaintiff's appeal, and Defendant reinstated Plaintiff to his old position on March 6, 2013 (but without compensation for his time out of service).  (Plf's Dep., at 148-56).  Plaintiff commenced this litigation three months later on June 6, 2013.

### III. DISCUSSION

#### A.    Rule 56 Standard

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In addition, where a moving party seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must be sufficient for the court to

hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). But, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

## B.    The Americans with Disabilities Act

Plaintiff brings his sole cause of action under the ADA's general proscription of discrimination by an employer against a qualified individual on the basis of a disability. 42 U.S.C. § 12112. More specifically, Section 12112(d) governs the ways in which an employer may seek out and then use an applicant or employee's medical information:

> (1) In general. The prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries.

* * *

(3) Employment Entrance Examination.  A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if--

    (A) all entering employees are subjected to such an examination regardless of disability;

    (B) information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that--

        (i) supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

        (ii) first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

        (iii) government officials investigating compliance with this chapter shall be provided relevant information on request; and

    (C) the results of such examination are used only in accordance with this subchapter.

(4) Examination and Inquiry.

    (A) Prohibited examinations and inquiries.  A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

11

> (B) Acceptable examinations and inquiries. A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.
>
> (C) Requirement. Information obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3).

A plaintiff need not prove that he or she is a qualified individual with a disability in order to state a claim under Section 12112(d). *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 252 (6th Cir. 2011).

## C.   Plaintiff's claim under 42 U.S.C. § 12112(d) fails as a matter of law

It bears repeating that Plaintiff's claim in this litigation only relates to his allegation that Defendant failed to keep medical information it obtained pursuant to an employment entrance examination confidential.[4]   Plaintiff does not challenge his termination.   Nor does Plaintiff challenge Defendant's use of medical examinations, including for example, whether Defendant subjects all entering employees to such examinations regardless of disability or whether Defendant

---

[4] Though neither party addressed the issue, the Court questions whether Plaintiff's claim here is more properly categorized as one under Section 12112(d)(4)(B) because Plaintiff's disclosure of his leg injury occurred as a result of an inquiry during his employment relative to his ability to return to work. Because Section 12112(d)(4)(C) expressly incorporates the confidentiality provisions of (d)(3), this is a nonissue.

failed to maintain his information on "separate forms and in separate medical files."  As set forth below, Plaintiff's confidentiality claim fails as a matter of law.

### 1.    Plaintiff's narrow interpretation of Section 12112(d)(3)(B)

The critical inquiry in this case is the breadth of Section 12112(d)(3)(B). Plaintiff contends that an employer must keep all medical information gained as a result of an employment entrance examination confidential, and that the three exceptions set forth in subsections (i) through (iii) are the *only* permissible disclosures an employer may make.  It is clear, and Defendant does not argue otherwise, that Defendant's disclosure of Plaintiff's medical information does not fall within these three express subsections (which relate to work restrictions, emergency treatment, and government investigations).   Because Defendant's disclosure did not fit within these three exceptions, Plaintiff requests that this Court enter partial summary judgment as to Defendant's liability.  (Plf's Mtn., Dkt. # 19).

In support of this narrow interpretation of Section 12112(d)(3)(B), Plaintiff directs this Court to three out of circuit district court cases that generally present the same fact pattern as the one here: *Downs v. Massachusetts Bay Transportation Authority*, 13 F. Supp. 2d 130 (D. Mass. 1998); *Blanco v. Bath Iron Works Corporation*, 802 F. Supp. 2d 215 (D. Maine. 2011); and *Tamburino v. Old Dominion Freight Lines, Inc.*, 2012 WL 526426 (D. Oregon Feb. 16, 2012).  In all three cases, an employer terminated an employee for presenting false information

2:13-cv-12484-GER-MJH   Doc # 31   Filed 07/31/14   Pg 14 of 30   Pg ID 625

during an employment entrance exam, and the employee subsequently brought a claim under Section 12112(d)(3) or corresponding state law. The Court discusses each case in turn.

In *Downs*, the employer terminated the plaintiff for failing to disclose during an employment entrance examination that he had previously received workers' compensation benefits and had injured his elbow. 13 F. Supp. 2d at 132-33. The plaintiff filed a claim for workers' compensation benefits a few years into employment and in processing the claim, the employer granted its workers' compensation claims representative "unlimited access" to the plaintiff's medical file. The claims representative discovered the nondisclosure, and the employer discharged the plaintiff. *Id.* at 133, 141.

In granting summary judgment to the plaintiff, the *Downs* court concluded that the claims representative's access to the plaintiff's medical information violated the confidentiality provisions of Section 12112(d)(3)(B). The court's entire discussion is as follows:

> Nor does the release of Downs's medical file to the claims representative fall within any of the permissible uses of this confidential information under the ADA and Rehabilitation Act. As Downs points out, the claims representative is neither a supervisor or manager, nor a first aid or safety person, nor a government investigator. Moreover, the purpose for which the information was sought and used does not meet any of the purposes recited by the ADA and Rehabilitation Act. Accordingly, the MBTA's release of Downs's medical file violated his right to confidentiality under these statutes.

14

*Id.* at 141-42.

Relying upon this reasoning, a Maine district court in *Blanco* denied a motion to dismiss a similar Section 12112(d)(3)(B) claim.   In that matter, the plaintiff failed to disclose that he was diagnosed as ADHD on an employment entrance examination, which the employer's in-house physician discovered after the plaintiff requested accommodations.  802 F. Supp. 2d at 217-18.  The physician disclosed the plaintiff's answers to the examination to the employer's labor relations department.   *Id.* at 218.   The employer subsequently terminated the plaintiff for failing to disclose his ADHD diagnosis.  *Id.*

The *Blanco* court resolved the defendant's motion "as a matter of straightforward statutory interpretation."   *Id.* at 222.   After finding that the exceptions governing emergency treatment and government investigations did not apply, the court then turned to the "one potential exception to allow disclosure of the information in the employment entrance examination medical file: 'supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations.'"   *Id.* at 222-23 (citing Section 12112(d)(3)(B)(i)).   Such an exception did not apply, according to the *Blanco* court, because there was:

> nothing in the Amended Complaint that would allow the Court to conclude that Dr. Mazorra disclosed the contents of the medical questionnaire to the Defendants' management personnel in order to

> advise them of "necessary restrictions on the work or duties" for Mr. Blanco or for "necessary accommodations." To the contrary, she disclosed the information to management because in her view he had lied on the questionnaire, not to advise them of necessary restrictions or accommodations. The Court cannot squeeze these facts into § 12112(d)(3)(B)(i).
>
> As none of the exceptions appl[y] and as a matter of direct statutory interpretation, the Court concludes that the Plaintiff has alleged sufficient facts to avoid dismissal as to whether Dr. Mazorra's disclosure violated the confidentiality provision of the ADA.

*Id.* at 223. The *Blanco* court also disagreed with the employer's argument that the confidentiality requirement only applies to "truthful information. . . . [T]here is no prevarication exception to the ADA's confidentiality mandate for employment entrance examinations, much less for information the company doctor perceives is inaccurate. It is the information, accurate or not, that the statute protects." *Id.* at 224. Finally, the court commented that *Downs* was "generally consistent" with this conclusion, again emphasizing that the "ADA does not bar employers from making employee-authorized disclosures of medical information; the ADA bars employers from unauthorized disclosures of information obtained from employment entrance examinations." *Id.* at 227.

The third case to which Plaintiff directs this Court is *Tamburino*, an unpublished case from the District of Oregon. As with the plaintiffs in *Downs* and *Blanco*, the plaintiff in *Tamburino* failed to disclose certain medical conditions -- scoliosis and carpal tunnel syndrome -- in connection with her hiring as a

16

commercial truck driver.  2012 WL 526426, at *1.  The employer fired her three years later after it discovered these omissions while processing a workers' compensation claim.  *Id.* at *2.  More specifically, the employer's workers' compensation manager reviewed her employment entrance examination documentation, compared it to her claim documentation, and discovered the discrepancy.  *Id.* at *3.  She then gave the plaintiff's medical examination documentation to the employer's vice president, "who made the decision to terminate [the plaintiff] for allegedly providing false information."  *Id.*

Drawing heavily from *Downs* and *Blanco*, the *Tamburino* court found that the plaintiff adequately stated a cause of action under Oregon's analogous statute governing employment entrance examinations.  In so reasoning, the court narrowly interpreted Oregon's statute (Or. Rev. Stat. 659A.133(3)(b)) and held that an employer could only disclose certain medical information as provided in the statute.  As applied, the court found that the two managers could only access the plaintiff's medical information solely "regarding 'necessary restrictions on the work or duties of the employee and necessary accommodations.'"  *Id.* at *9.  The *Tamburino* court also rejected the employer's argument that the plaintiff's falsified documentation rendered her ineligible to be an employee, and therefore the disclosure was related to the plaintiff's "work or duties:" "the reference to work restrictions and accommodations can only be interpreted as those based on physical

17

or mental disabilities, not on some employment policy against falsifying information." *Id.*

### 2.   *Lee*, EEOC guidance, and other persuasive authority

At first blush, these factually analogous cases seemingly support Plaintiff's position that Section 12112(d) must be read narrowly to only permit disclosure in the three enumerated manners.  After all, the statute provides three exceptions to the general confidentiality requirement and there is no dispute that Defendant's use of Plaintiff's medical information did not involve these exceptions.  The problem with this interpretation and these cases, however, is that they cannot be reconciled with the Sixth Circuit's decision in *Lee v. City of Columbus*, 636 F.3d 245 (2011), as well as with very persuasive authority published by the Equal Employment Opportunity Commission (EEOC).

In *Lee*, several employees challenged the City of Columbus's policy requiring that employees seeking to return to employment following sick leave, injury leave, or restricted duty to, among other things, provide a copy of a physician's note "stating the 'nature of the illness' and whether the employee is capable of returning to regular duty, 'to [their] immediate supervisor.'"  *Id.* at 247-48.  The employees alleged that this policy violated the Rehabilitation Act -- which incorporates "the ADA's limitations on the disclosure of medical information set forth in 42 U.S.C. § 12112(d)."  *Id.* at 247, 252.  In granting summary judgment to

18

the employees, the district court determined that the policy violated Section 12112(d)(4)(A) "because supervisory personnel in the chain of command are not authorized by the statute to have unfettered access to confidential medical information."  *Id.* at 251.  The district court did so upon a narrow reading of the ADA -- one that is not dissimilar from the *Downs, Blanco*, and *Tamburino* courts:

> The ADA and its implementing rules explicitly provide for disclosure of such medical information to a supervisor only in select circumstances, and by so expressly limiting disclosure, the statutory scheme implicitly forecloses disclosure to supervisors for purposes that fall outside those narrow and specific purposes.  If the ADA were intended to allow full disclosure to a supervisor in all instances, then there would be no need for the specific disclosure to a supervisor language.  *See, e.g.,* 42 U.S.C. § 12112(d)(3)(B)(i).  The city's view would mean that the explicit exception for supervisors was mere surplusage, but there is no basis to reach the conclusion that Congress did not intend for the specific language concerning supervisors to constitute a substantive provision.

*Id.* at 251-52 (citing the district court's opinion).  It therefore found that the policy "was overly intrusive and improperly provided supervisors with confidential medical information even when they had no reason to possess such knowledge, particularly in light of the fact that the City had a human resources department which presumably could be used to create a 'confidentiality barrier between these personnel, whose jobs consist of handling medical information, and supervisors.'"  *Id.* at 252 (citation omitted).

In reversing, the Sixth Circuit expressly rebuffed the district court's narrow reading of Section 12112(d):

The ADA clearly permits an employer, including by express definition a supervisor (as an "agent" of the employer), to make inquiries and receive medical information in accordance with § 12112(d). *See* 42 U.S.C. § 12111(2) and (5)(A). Nothing in § 12112(d) prohibits the City from designating an employee's immediate supervisor as the initial contact for purposes of administering its sick leave benefits.

*The confidentiality provisions set forth in § 12112(3)(B)(i), cited by the district court, "protect disabled employees from job discrimination by ensuring that the results of job-related medical examinations would not be kept in their personnel files. The statute goes no further than requiring employers to keep that limited class of medical records confidential[.]"* Yoder v. Ingersoll–Rand Co., *31 F.Supp.2d 565, 569 (N.D. Ohio 1997),* aff'd, *172 F.3d 51 (6th Cir. 1998) (table).* Section 12112(3)(B)(i) neither expressly nor implicitly restricts the role of supervisory personnel in receiving and processing an employee's medical information.*

Plaintiffs have no basis to challenge the Directive based on unwarranted speculation that supervisors will disobey the statute's confidentiality strictures or the City's Directive. Supervisors are obligated to follow the City's rules and policies, which include an express prohibition against discrimination on the basis of disability and disclosure of confidential medical information. Division policy prohibits supervisors from sharing or disseminating doctors' notes or any confidential information contained therein.

*Id.* at 258 (emphasis added).[5]  *Lee*, therefore, defines the scope and intent of Section 12112(d)'s use of the phrase "confidential" -- it must be interpreted with an eye towards eliminating discriminatory actions by employers on the basis of information gleaned from job-related medical examinations.

---

[5] The *Lee* court also noted that such an interpretation was consistent with both the EEOC's policy governing sick-leave for its own employees and the EEOC's administrative guidance. *Id.*

Plaintiff unconvincingly argues that *Lee* "is limited to the facts of that case and has no application to the facts before this Court." (Plf's Resp., Dkt. # 23, at 15). He notes that *Lee* only involved the disclosure of medical information of employees returning from leave, not information garnered from an employment entrance examination. (*Id.* at 16-18). The *Tamburino* court also echoes this argument, distinguishing *Lee* as follows:

> However, *Lee* addressed physicians' notes for sick leave and not the post-offer questionnaires at issue here. Here the issue is whether the information was utilized consistent with the purpose of the statute for determining necessary restrictions or accommodations. A review for disciplinary purposes is not consistent with that purpose.

*Tamburino*, 2012 WL 526426, at *10. This Court is not convinced that there is a distinction in this difference. Though *Lee* analyzed the provision governing medical examinations and inquiries of current employees (Section 12112(d)(4)), that provision expressly incorporates the confidentiality provision contained within the provision governing employment entrance examinations (Section 12112(d)(3)(B)). 42 U.S.C. § 12112(d)(4)(C); *Lee*, 363 F.3d at 250-51.

Plaintiff also asserts that *Lee* stands for the limited proposition that Defendant could have disclosed Plaintiff's medical information contemporaneously with his hiring in 2007 for the purpose of evaluating "necessary accommodations, restrictions or general fitness for duty with supervision at that time." (Plf's Resp., Dkt. # 23, at 17). But *Lee* counsels that

21

Section 12112(d) cannot be so strictly construed given the breadth with which it breathes into the word "confidential." And, as set forth in the following paragraphs, guidance from the EEOC and other courts confirm that the Section's confidentiality provision cannot be used to protect an employee from an adverse action that is not on the basis of a disability (which Plaintiff does not allege), but rather upon an employee's failure to disclose requested information during an employment entrance examination.

First, the *Lee* Court's endorsement of a broader statutory interpretation meshes with the EEOC's own interpretation of Section 12112(d). The EEOC's Enforcement Guidance on employment entrance examinations contemplates that decision makers may have medical information when making an employment decision so long as that decision is made "consistent with the ADA:"

> *May medical information be given to decision-makers involved in the hiring process?*
>
> *Yes. Medical information may be given to -- and used by -- appropriate decision-makers involved in the hiring process so they can make employment decisions consistent with the ADA.* In addition, the employer may use the information to determine reasonable accommodations for the individual. For example, the employer may share the information with a third party, such as a health care professional, to determine whether a reasonable accommodation is possible for a particular individual. The information certainly must be kept confidential.
>
> *Of course, the employer may only share the medical information with individuals involved in the hiring process (or in implementing an affirmative action program) who need to know the information.* For

> example, in some cases, a number of people may be involved in evaluating an applicant. Some individuals may simply be responsible for evaluating an applicant's references; these individuals may have no need to know an applicant's medical condition and therefore should not have access to the medical information.

EEOC, ENFORCEMENT GUIDANCE: PREEMPLOYMENT DISABILITY-RELATED QUESTIONS AND MEDICAL EXAMINATIONS (Oct. 10, 1995) (emphasis added), *available at* http://www.eeoc.gov/policy/docs/preemp.html. The EEOC has also opined that employers may separate employees who falsify information on employment entrance examinations. EEOC, A TECHNICAL ASSISTANCE MANUAL ON THE EMPLOYMENT PROVISIONS (TITLE I) OF THE AMERICANS WITH DISABILITIES ACT § 9.8 ("An employer may refuse to hire or may fire a person who knowingly provides a false answer to a lawful post-offer inquiry about his/her condition or workers' compensation history."). Here, individuals other than the Medical Department -- i.e., those individuals involved in evaluating whether to take an adverse action (an "employment decision") against Plaintiff -- needed information concerning Plaintiff's failure to disclose his prior injury. Defendant's disclosure in this instance is consistent with the EEOC's reasonable interpretation of the ADA that decision makers may have access to an employee's medical information for the purpose of making an employment decision *consistent* with the ADA.

Plaintiff takes issue with this administrative guidance. First, what Plaintiff does not do. Though Plaintiff generally references that "pronouncements from the

EEOC are not binding on this Court" (Plf's Resp., Dkt. # 23, at 23) (citing *White v. Burlington N. and Santa Fe Ry. Co*, 364 F.3d 789, 812 (6th Cir. 2004) *and Lee, supra*), Plaintiff leaves out the fact that this guidance "while non-binding 'constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Lee,* 636 F.3d at 256 (citation omitted and alteration in original); *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 815 (6th Cir. 2012) (describing *Lee* as "reaffirm[ing] that the EEOC Enforcement Guidance is 'very persuasive authority' in questions of statutory interpretation of the ADA"). He has put forth no argument as to why the EEOC's Enforcement Guidance is substantively unreasonable. Second, Plaintiff points to the fact that the EEOC issued the following reasonable cause determination in this case: "Based on the evidence obtained during the investigation, there is reasonable cause to believe that [Defendant] violated the ADA by terminating the [Plaintiff]'s employment on the basis of its impermissible disclosure of his confidential records." (Plf's Resp., Dkt. # 23, at 23; Ex. 13A to Plf's Resp., Dkt. # 30-1). This may be true, but the record is silent as to what facts -- such as the evidence available to the EEOC at the time that it came to this conclusion -- the EEOC considered when making this determination. Moreover, the EEOC's reference to "terminating the Charging Party's employment" suggests the EEOC's determination goes to the merits of Plaintiff's discharge rather than Defendant's

24

disclosure of his medical information.  Without such facts and clarification, this Court refuses to draw any inference based on this determination.  *Alexander v. CareSource*, 576 F.3d 551, 563 (6th Cir. 2009).[6]

Second, other courts have relied upon the EEOC's body of expertise to similarly reject such narrow constructions of Section 12112(d).  In *O'Neal v. City of Albany*, for example, the Seventh Circuit also relied upon the EEOC's Preemployment Disability-Related Questions and Medical Examinations Guidance to find that an employer did not violate its confidentiality obligations by providing the results of an applicant's medical examination to hiring managers:

> [S]uch a disclosure was contemplated by § 12112(d)(3), given that the statute permits employers to condition a job offer on the results of a medical examination, . . . [that the hiring managers] needed to know the results, . . . [and that the plaintiff did] not allege that his medical information was provided to anyone else in the police department or that it was disseminated to anyone outside of the police department.

293 F.3d 998, 1009 (7th Cir. 2002).  Similarly, a Northern District of Georgia court held that an in-house attorney's forwarding of a former employee's medical information held by the employer's third-party FMLA administrator to outside

---

[6] Plaintiff also contends that the above quotation from the Technical Assistance Manual only relates to evaluating a workers' compensation claim and is taken out of context.  But there is nothing unique to the circumstances under which an employer learns of a misrepresentation for purposes of evaluating a workers' compensation claim versus another instance, such as in processing an employee's return to work paperwork.

counsel for the purpose of defending against litigation brought by the former employee did not violate Section 12112(d):

> [T]he proper concern is "ensuring that the information disclosed pursuant to an employer's medical inquiry spreads no farther than necessary to satisfy the legitimate needs of both employer and employee." Here, the Court finds that preserving and obtaining documents for the purpose of defending oneself in ongoing litigation is a legitimate purpose. And, that limiting the disclosure to the in-house counsel assigned to the litigation and the outside counsel defending the suit is no further than necessary.

*Floyd v. SunTrust Banks, Inc.*, 878 F. Supp. 2d 1316 (N.D. Ga. 2012) (citing *Doe v. United States Postal Service*, 317 F.3d 339, 344 (D.C. Cir. 2003)) (emphasis added); *see also Scott v. Leavenworth Unified Sch. Dist.*, 190 F.R.D. 583, 585-87 (D. Kan. 1999) (rejecting an employer's strict reading of Section 12112(d) in the context of a discovery privilege dispute). Contrary to Plaintiff's position that these cases are factually distinct (Plf's Resp., Dkt. # 23, at 18-22), they stand for the more general proposition that Section 12112(d) cannot be read through the narrow prism that Plaintiff suggests.

### 3.    Application

Consistent with *Lee*, the EEOC's guidance, and the other above cited authority, this Court finds that Plaintiff has not established that there are material facts in dispute as to whether Defendant violated Section 12112(d)'s

26

confidentiality requirements.[7]  Defendant's medical personnel disclosed Plaintiff's prior injury (and his failure to disclose such an injury) to Defendant's Labor Relations Department, who in turn authorized the disclosure to Plaintiff's supervisor for the purpose of commencing an investigative hearing.  There is nothing in the record indicating that Defendant disclosed Plaintiff's information to those individuals who did not need to know, or that the information (in contrast to his omission) was used to take an adverse action against Plaintiff.  Moreover, Defendant took steps to limit the information that was disclosed by redacting information not pertinent to the disciplinary investigation.

While supported by some out of circuit case law, Plaintiff's interpretation is inconsistent with binding Sixth Circuit authority and would stand the ADA on its head.  To accept Plaintiff's position on the structure of Section 12112(d), this Court must sanction a no-win proposition for any employer.  That is, if an employee provides false information that goes undetected during an ADA authorized examination but later comes to light, the employer could either: (1) use the information -- or for that matter, the lack of disclosing certain information -- and risk liability under Section 12112(d); or (2) don't use the information and therefore encourage employees to be less than forthcoming during such

---

[7] It is, therefore, unnecessary for this Court to determine whether Defendant's obligations to comply with the CBA and the Railway Labor Act alternatively authorized the disclosure.

examinations.  This Court cannot hold that the ADA insulates an employee from an adverse action when that employee fails to provide accurate information on an employment entrance examination because such a use is not expressly enumerated within Section 12112(d).  The express purpose of the Americans with Disabilities Act, as amended, is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  This protective shield provided to employees by the ADA cannot also be used by these employees as a sword to defend an employee's own dishonest conduct.  As set forth in *Lee*, Section 12112(d)'s confidentiality provisions "protect disabled employees from job discrimination by ensuring that the results of job-related medical examinations would not be kept in their personnel files."  For this Court to extend this purpose of protecting against discrimination on the basis of disability to permit Plaintiff to bring his claim under Section 12112(d) -- whether he fits within the statutory definition of a qualified individual with a disability or not -- would lead to "an absurd result[]" and "an interpretation inconsistent with the intent of Congress."  *Walker v. Bain*, 257 F.3d 660, 667 (6th Cir. 2001).[8]

---

[8] Plaintiff's theory also cuts against the public policy foundations of Section 12112(d).  This Section recognizes that employers have workplace safety obligations to consider when hiring applicants and returning employees to work from a medical-related leave, and as such, expressly authorizes employers to conduct medical examinations within the confines of the ADA.  Employers that

The Court therefore enters Summary Judgment for Defendant and dismisses Plaintiff's Complaint with prejudice.

## IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [Dkt. # 21] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment [Dkt. # 19] is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**


Dated: July 31, 2014                          s/Gerald E. Rosen
                                              Chief, Judge, United States District Court

---

fail to take these workplace safety obligations into account -- especially in "safety-sensitive" work environments such as Plaintiff's -- risk exposure to liability on a multitude of levels. As but one example, consider Defendant's potential liability in the following hypothetical: Defendant does not conduct medical examinations as part of its hiring practice for conductors, fails to discover that Plaintiff's leg injury did not in fact heal, and Plaintiff's leg injury causes a train accident -- one that could have been avoided but for the injury. Permitting an employer to take an adverse action against an employee for failing to provide accurate information during an employment entrance examination is consistent with Section 12112(d)'s public policy anchor as it encourages employees to provide accurate information to employers about their medical history.

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 31, 2014, by electronic and/or ordinary mail.

s/Julie Owens_____
Case Manager, (313) 234-5135